William **JOHNSTON** and Susan Johnston, Plaintiffs,

v.

**SONAT MARINE, INC.** and Interstate Oil Transportation Co., Defendants.

No. 84 CV 3834.

United States District Court, E.D. New York.

Sept. 30, 1987.

Johnson, Tannen, Brecker, Feit & Heller, New York City, for plaintiffs.

Costello & Shea, New York City, for defendants.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

Plaintiff in this negligence action seeks recovery for injuries allegedly sustained when he fell from a ladder as he attempted to board a barge owned and operated by defendant. A bench trial was held on May 4, 5, 7 and 8, 1987. The following are the Court's findings of fact and conclusions of law.

### Findings of Fact

On February 28, 1983 plaintiff William Johnston was employed by Mobil Oil Corporation at its facility at Port Mobil, Staten Island, New York. Plaintiff's work as a bulk plantman and gauger required him to measure and inspect tanks of oil on land and aboard vessels.

At approximately 2:05 p.m. on February 28, 1983 the barge *Interstate 70* docked at Port Mobil. The motorless barge was propelled by the tug *Traveler*. The barge was connected to the dock by four lines, which were placed by plaintiff onto cleats on the dock's stringpiece, a wooden block approximately one foot square running the length of the bulkhead. The lines were tightened from the barge by means of hydraulic capstans. The lines were taut but not rigid, in order to accommodate changes in the tide. The tug was "made up" alongside the barge, connected by various lines.

The barge is 350 feet long, seventy feet wide and 25.5 feet top to bottom. On the day in question the barge carried no product and thus "rode high." It was under water only about 3.5 feet. The dock was at the barge's sixteen-foot mark, which means that the distance from the dock to the deck of the barge was 9.5 feet.

A crew member on the barge lowered a twenty-foot wooden ladder to the dock. The top part of the ladder was secured to the barge by a three-foot lanyard attached to a wire cable on the railing of the barge. The foot of the ladder was not affixed to the dock. Whether it was propped against the stringpiece is not clear. Plaintiff testified at trial that the stringpiece was too close to the edge of the dock to serve as an abutment for the ladder. He stated that the dock has since been extended by the addition of a metal grating, so that a ladder from a barge can now lean against the stringpiece, but that at the time of his accident such a procedure would be unworkable because the ladder would be too vertical to climb. He testified that as he climbed to the barge on February 23, 1983, the ladder cleared the stringpiece and simply stood unsecured on the dock. He stated at his deposition, however, that the ladder was against the stringpiece. The mate aboard the barge could not recall if there was a stringpiece, but stated that it would be used to prop the ladder if it were there. Plaintiff's co-worker Thomas Byrd testified that the ladder cleared the stringpiece.

On the day of the accident, an inspector from the Mullin Company first climbed the ladder without incident. Plaintiff then began to ascend. When his head was about level with the deck of the barge, he fell backward off the ladder and struck his head on the dock. Plaintiff claims to have fallen ten to twenty feet. As noted earlier, however, the distance from the dock to the deck of the barge was 9.5 feet. Plaintiff is six feet, five inches tall. His head was level with the deck, so his feet were approximately three feet above the dock. He thus fell a distance much shorter than that to which he testified.

Plaintiff asserts that, while he was climbing aboard, the tug *Traveler* began to move away from the barge, causing a "slingshot effect" that whipped him off the ladder. Movement of the tug could not have been the cause of plaintiff's fall, however, because the tug was still "made up" to the barge at the time. Barge mate David Steckel wrote in the barge log, in the ordinary course of business and within one hour of the accident, that the tug was still tied to the barge when plaintiff fell.

Applicable regulations require that the tug be detached prior to the opening of the barge's ullage caps. Plaintiff concludes that this means that the tug was free when he fell, because the purpose for which he and the Mullin inspector were boarding the barge required that the caps be opened.

There is no testimony, however, that the caps were opened before plaintiff began to climb or that they could not be opened once he was aboard (or, for that matter, that the regulation was observed).

Thomas Byrd, another Port Mobil employee, testified that the tug moved at the time of the accident. His recollection is unreliable for several reasons. His testimony varied widely as to how far he was from the barge when he made his observations. Moreover, it would have been difficult, if not impossible, for him to see the tug over the barge from the various distances he said he stood. Byrd also testified that the ladder was aluminum; all other witnesses, including plaintiff, testified that it was wood.

When plaintiff fell, hitting his head on the ladder, Byrd, Steckel and others rushed to his side. Plaintiff lit a cigarette. He was dazed and bruised but did not lose consciousness. He was taken to Richmond Memorial Hospital where he was treated and released. Hospital records describe plaintiff's injuries as scalp contusions, although he was given post-discharge instructions consistent with concussion.

Approximately three weeks after the accident, plaintiff developed blepharospasm, a twitching of the muscles around the eyes and mouth. He returned to work, however, and performed his duties as a bulk plantman and gauger without incident until August 2, 1983, when he fell on a spiral stairway around a land-based oil tank and broke his elbow. Plaintiff testified that he fell because he became dizzy as he descended, but the report he completed shortly thereafter states that he slipped on a wet step.

Plaintiff returned to work after this fall on September 19, 1983. While climbing a ladder on a land-based oil tank, he "froze," became upset and agitated, and was unable to descend unassisted. He has not worked since that date. Plaintiff's injuries make it impossible for him to continue as an oil worker or perform most forms of sedentary work, although he can drive and care for himself. He receives disability payments. Early in 1984, plaintiff became despondent and attempted suicide. Later that year, he and his wife separated.

Various physicians have treated plaintiff for blepharospasm and associated physical and psychological symptoms, including headaches, dizziness, memory lapse, imbalance, loss of coordination, cognitive impairments, and depression. Dr. Jason Brown, a neurologist, testified that the fall on February 28, 1983 was the cause of plaintiff's blepharospasm and other symptoms. He based this conclusion on the temporal nexus between the accident and the development of the condition, and on the absence of any detectable disease process. He admitted that he had seen no reference in the medical literature to blepharospasm being caused by trauma to the head. He also stated that the August 2, 1983 fall was a result of the injuries sustained on February 28, and that the September 19 "freezing" episode was also related to the February incident.

Dr. David Inwood, a psychiatrist, has treated plaintiff since March 1984. Dr. Inwood diagnosed movement disorder, chronic depression and affective disorder, and post-traumatic stress reaction, and opined that these conditions, which are disabling, were caused by the February 28 accident. He also testified that the injuries contributed to the failure of plaintiff's marriage and the September 19 freezing incident.

Defense psychiatrist Dr. David Yamins examined plaintiff and diagnosed depression and blepharospasm of unknown etiology. He stated that plaintiff's condition was a function of a long-standing personality disorder. He also testified that plaintiff was not suffering from post-traumatic stress disorder, which is usually associated with catastrophic, life-threatening situations—such as combat or a natural disaster—that are out of the patient's control. Plaintiff's accident did not, in Dr. Yamins' opinion, rise to such a level.

Defendants' neurologist, Dr. Murray Budabin, testified that the brain stem injury causing plaintiff's blepharospasm was organic, not traumatic, in origin. He described the condition as idiopathic—caused

by disease—and stated that a trauma sufficient to damage the brain stem, a structure deep within the brain, would have been accompanied by a loss of consciousness and more severe physical injuries than plaintiff sustained. Dr. Budabin did not know what caused plaintiff's condition but stated that its development shortly after the accident was coincidental.

### Conclusions of Law

Jurisdiction is proper in this Court on the basis of diversity of citizenship. 28 U.S.C. § 1332. Plaintiff is a resident of New York and defendant is a foreign corporation with its principal place of business in Pennsylvania.

Plaintiff puts forth three theories of liability, all of which require a similar analysis: 1) common law negligence; 2) the Longshoreman and Harbor Workers Compensation Act ·§ 5(b), 33 U.S.C. § 905(b), which provides for recovery by certain persons injured by the negligence of a vessel; and 3) Occupational Safety and Health Administration ("OSHA") Regulations—specifically section 1915.44(a)(1) of OSHA 2268 (Shipyard Industry) (amended 1976), 29 C.F.R. § 1915(a)(1) which requires that ladders used for access to vessels afloat be "adequately secured against shifting or slipping." Defendants dispute the applicability of OSHA regulations to the operation at issue here, pointing out that the section imposes a duty only on employers; refers only to shipbuilding, ship repairing and ship breaking activities; and specifically exempts barges. Plaintiff has proffered no authority for the applicability of the regulation. In light of my factual findings above and my legal conclusions below, however, I need not resolve this issue.

Defendant does not dispute that it was under a duty to exercise reasonable care so that the vessel was in reasonably safe condition for plaintiff to board. The existence of this duty is the first element of a negligence claim; the others, which plaintiff must prove by a preponderance of the evidence, are breach, cause and harm. Plaintiff's case founders at the second step.

The barge was adequately secured. Plaintiff placed the lines on the cleats, and there is no indication that there was anything out of the ordinary about this operation. Although mate Steckel did not specifically recall affixing the lines on the day in question, he stated that he would definitely have used hydraulic capstans to tighten the several ropes holding the barge to the dock. The ladder was also adequately tied to the barge, although a certain amount of slack was left in the lanyard to accommodate the tides. While it is not clear whether the ladder was propped against anything on the dock, all witnesses were in agreement that a stringpiece would have been used as an abutment if it were present. In any event, the presence or absence of a stringpiece that could be used to buttress the ladder would be the responsibility of plaintiff's employer, which owned and maintained the dock, and not that of the barge owner.

Perhaps most important, the tug did not move while plaintiff was on the ladder. The log entry and Steckel's testimony indicate that the tug was still secured to the barge at the time. *See The Georgian*, 76 F.2d 550, 551, (5th Cir.1935). Because I have found that the tug did not move, I need not address defense contentions that even if the tug had been pulling away, it would not have caused the barge to move as plaintiff asserts, and that even if the barge did shift, the ladder could not have been caused to "slingshot."

Defendant discharged its duty to use reasonable care to provide plaintiff a safe means of access to the barge. It adequately secured the barge and the ladder. Because the Court cannot accept the central premise of plaintiff's liability theory—that the tug moved—, it is obligated to hold that defendant breached no duty to plaintiff. It appears that, most unfortunately, plaintiff simply slipped.

Moreover, even if plaintiff were able to establish his version of the facts of the accident and the breach element were met, he would have difficulty in carrying his burden of establishing causation—that his condition was occasioned by the accident.

Although the temporal connection is remarkable, the weight of the medical evidence establishes that if blepharospasm can be attributed to trauma at all, the trauma would have to be much more severe than that experienced by plaintiff.

*Conclusion*

Plaintiff's condition is serious and debilitating. The Court is constrained, however, to conclude that plaintiff has not shown that his damages are a result of a breach of duty on the part of the defendant. Accordingly, judgment shall be entered for the defendant.

SO ORDERED.